**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AT&T COMMUNICATIONS OF THE
SOUTHERN STATES, INCORPORATED,
Plaintiff-Appellant,

and

UNITED STATES OF AMERICA; FEDERAL
COMMUNICATIONS COMMISSION,
Intervenors/Plaintiffs,

v.

BELLSOUTH TELECOMMUNICATIONS,
INCORPORATED; NORTH CAROLINA
UTILITIES COMMISSION; JOANNE

SANFORD; ALLYSON K. DUNCAN;
RALPH A. HUNT; JUDY HUNT;
WILLIAM PITTMAN, The
Commissioners of The North
Carolina Utilities Commission, in
their official capacities; J. RICHARD
CONDER, Commissioner of the North
Carolina Utilities Commission;
ROBERT V. OWENS, JR.,
Commissioner of the North Carolina
Utilities Commission,
Defendants-Appellees.

No. 98-1959

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-97-405-5-BR)

Argued: June 5, 2000

Decided: October 6, 2000

Before WIDENER and KING, Circuit Judges, and Henry M. HERLONG, Jr., United States District Judge for the District of South Carolina, sitting by designation.

_____

Remanded by published opinion. Judge King wrote the opinion, in which Judge Widener and Judge Herlong joined.

_____

**COUNSEL**

**ARGUED:** Matthew Woodruff Sawchak, SMITH, HELMS, MULLISS & MOORE, L.L.P., Raleigh, North Carolina, for Appellant. Geoffrey M. Klineberg, KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C., Washington, D.C., for Appellees. **ON BRIEF:** James G. Exum, Jr., Peter J. Covington, Corby C. Anderson, SMITH, HELMS, MULLISS & MOORE, L.L.P., Raleigh, North Carolina, for Appellant. Michael K. Kellogg, KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C., Washington, D.C.; Edward L. Rankin, III, BELLSOUTH TELECOMMUNICATIONS, INC., Charlotte, North Carolina; J. Philip Carver, BELLSOUTH TELECOMMUNICATIONS, INC., Atlanta, Georgia; James P. Cain, Benjamin R. Kuhn, KILPATRICK STOCKTON, L.L.P., Raleigh, North Carolina, for Appellees.

_____

**OPINION**

KING, Circuit Judge:

AT & T Communications of the Southern States, Inc. ("AT & T") has appealed from an order of the Eastern District of North Carolina striking Paragraph 30.5 from its interconnection agreement with BellSouth Telecommunications, Inc. ("BellSouth"). After this appeal was initiated, but before it was argued, the Supreme Court issued a decision that changed the law underlying the articulated basis for the district court's order. Because the applicable law has changed, the

district court should be permitted to reconsider its order, and we therefore remand this case to the district court.

I.

The law controlling this appeal has changed several times since AT & T filed suit in this case, and we have determined it appropriate to review the complicated procedural history in some depth. We begin with the statute underlying this appeal.

A.

This case arises in the wake of the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 251 et seq.) ("the 1996 Act"). Prior to the passage of the 1996 Act, local telephone companies, including BellSouth, enjoyed a regulated monopoly in the provision of local telephone services to businesses and residential consumers within their designated areas. The 1996 Act sought to break these local monopolies, and it included, as one means to this end, a comprehensive regulatory scheme designed to facilitate the entry of other telecommunications companies into local markets.

Among other things, this comprehensive scheme required that the monopoly incumbent local exchange carrier ("ILEC") for a particular area enter into interconnection agreements with telecommunications carriers that sought to compete in that market ("competing local exchange carrier" or "CLEC"). Under the comprehensive scheme, the CLEC could utilize all or part of the ILEC's existing infrastructure to provide local phone service. In short, to facilitate competition in local phone markets, the 1996 Act gave CLECs the option to purchase access to the existing infrastructure of the ILEC.

The 1996 Act promulgated three different scenarios under which a CLEC could utilize the existing infrastructure of an ILEC. In one scenario, the CLEC could purchase "unbundled network elements" from the ILEC. See 47 U.S.C. § 251(c)(3). These unbundled network elements are, quite literally, the individual components of the ILEC's telecommunications infrastructure, and the ILEC is required to "provide such unbundled network elements in a manner that allows

3

requesting carriers to combine such elements in order to provide . . . telecommunications service." 47 U.S.C. § 251(c)(3). As a general matter, when the CLEC purchases access to the infrastructure of the ILEC on the "unbundled network elements" basis, the CLEC pays rates based on the ILEC's costs for each unbundled element ("cost rates"). See 47 U.S.C. § 252(d)(1).

In another scenario, the CLEC may purchase "any telecommunications service that the [ILEC] provides at retail to subscribers who are not telecommunications carriers." See 47 U.S.C. § 251(c)(4). The CLEC thus may purchase a complete, finished service; however, under a separate provision of the 1996 Act, if the CLEC purchases services on this basis, it pays "wholesale rates" that are calculated "on the basis of retail rates." See 47 U.S.C.§ 252(d)(3) ("wholesale rates"). Because wholesale rates should, as a matter of course, exceed cost rates, the CLEC has a substantial incentive to obtain services on a cost (unbundled) basis, rather than on a wholesale basis.[1]

The 1996 Act also enables the FCC to identify, within limits set forth in the 1996 Act, elements of the ILEC's network to which the CLEC was to have access on an unbundled basis:

> In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Commission shall consider, at a minimum, whether--
>
> (A) access to such network elements as are proprietary in nature is necessary; and
>
> (B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.

47 U.S.C. § 251(d)(2). In other words, the FCC was to apply the "necessary and impair" standards to identify the network elements that the

_____

[1] Under the third scenario, which is not implicated in this case, a CLEC can interconnect its own facilities with the network of the ILEC.

ILEC was to provide on an unbundled basis. See AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 387 (1999).

B.

Prior to passage of the 1996 Act, BellSouth was the monopoly ILEC in North Carolina. After the passage of the 1996 Act, AT & T sought to enter BellSouth's market as a CLEC, and BellSouth and AT & T began, in the spring of 1996, negotiating an interconnection agreement. When, in July 1996, AT & T and BellSouth reached an impasse on several issues, AT & T petitioned the North Carolina Utilities Commission ("NCUC") for arbitration. See 47 U.S.C. § 252(b).

Approximately one month after AT & T petitioned for arbitration, the Federal Communications Commission ("FCC") issued its first Report and Order implementing the 1996 Act, see In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 FCC Rcd 15499 (1996) ("First Report & Order"), and also promulgated Rules pursuant to the 1996 Act. Three of those rules are relevant here. First, under Rule 319, the primary unbundling rule, the FCC set forth a minimum number of network elements that incumbents must make available to the requesting carrier. See 47 C.F.R. § 51.319 (1997). "[Rule 319] require[d] an incumbent to provide requesting carriers with access to a minimum of seven network elements: the local loop, the network interface device, switching capability, interoffice transmission facilities, signaling networks and call-related databases, operations support systems functions, and operator services and directory assistance." 525 U.S. at 387-88. The second rule relevant to this appeal is Rule 315, which provides:

> (a) An incumbent LEC shall provide unbundled network elements in a manner that allows requesting telecommunications carriers to combine such network elements in order to provide a telecommunications service.
>
> (b) Except upon request, an incumbent LEC shall not separate requested network elements that the incumbent LEC currently combines.

5

(c) Upon request, an incumbent LEC shall perform the functions necessary to combine unbundled network elements in any manner, even if those elements are not ordinarily combined in the incumbent LEC's network, provided that such combination is:

(1) Technically feasible; and

(2) Would not impair the ability of other carriers to obtain access to unbundled network elements or to interconnect with the incumbent LEC's network.

(d) Upon request, an incumbent LEC shall perform the functions necessary to combine unbundled network elements with elements possessed by the requesting telecommunications carrier in any technically feasible manner.

(e) An incumbent LEC that denies a request to combine elements pursuant to paragraph (c)(1) or paragraph (d) of this section must prove to the state commission that the requested combination is not technically feasible.

(f) An incumbent LEC that denies a request to combine elements pursuant to paragraph (c)(2) of this section must prove to the state commission that the requested combination would impair the ability of other carriers to obtain access to unbundled network elements or to interconnect with the incumbent LEC's network.

47 C.F.R. § 51.315 (1997). Third, in what has been called the "all elements" rule, the FCC "allow[ed] competitors to provide local phone service relying solely on the elements in an incumbent's network." 525 U.S. at 392.

Rule 315, in combination with the other relevant provisions, had several effects on the obligations of the parties to an interconnection agreement. First, the ILEC had to provide access to the seven network elements in unbundled form. Second, with respect to combining the

6

unbundled elements: (1) the ILEC had to provide the unbundled elements in a manner that permitted the CLEC to combine them; (2) the network elements in the existing network of the ILEC that were already combined were not to be separated unless the CLEC so requested; and (3) the onus fell on the ILEC, rather than the CLEC, to recombine unbundled elements as requested by the CLEC. Third, the CLEC could utilize all seven of the elements of the ILEC's existing network.

C.

In this context, the NCUC, acting on AT & T's July 1996 petition for arbitration, conducted its arbitration of the interconnection agreement at issue here. In that regard, the NCUC determined, in its application of the FCC Rules, that if AT & T, (the CLEC), sought to purchase unbundled network elements and recombine those elements to replicate a service already offered by BellSouth (the ILEC), then AT & T was required to pay the higher wholesale rates, rather than the lower cost rates. This interpretation of the FCC rules was captured in Paragraph 1.A of the interconnection agreement, which was approved by the NCUC on May 12, 1997:

> AT & T may purchase unbundled Network Elements for the purpose of combining Network Elements in any manner that is technically feasible, including recreating existing Bell-South services. The purchase and combination of unbundled network elements by AT & T to produce a service offering that is [currently offered at retail by BellSouth] will be presumed to constitute a resold service for purposes of pricing, collection of access and subscriber line charges . .. . This presumption may be overcome by a showing that AT & T is using its own substantive functionalities and capabilities, e.g. loop, switch, transport, or signaling links, in addition to the unbundled Network Elements to produce the service. Ancillary services such as operator services and vertical services are not considered substantive functionalities or capabilities for purposes of this provision.

J.A. 12. In its May 22, 1998 decision from which this appeal was taken, the district court concisely explained the import of Paragraph 1.A:

7

Reduced to its essence, this provision states that AT & T can combine unbundled elements in any manner it chooses. However, if the combination creates a service that BellSouth already offers, the new LEC must pay the higher wholesale rates, instead of the cost-based rates, for the unbundled elements. The only way AT & T can avoid the wholesale pricing scheme is if it uses some of its own facilities to provide the service. In other words, AT & T must add something of its own before it is entitled to the cost-based rates. Paragraph 1.A treats requests to purchase and combine network elements to create an established BellSouth service as a request to purchase BellSouth's retail service, thus allowing BellSouth to charge higher rates. As a final caveat, the provision advises that operator services will not be considered sufficient to qualify AT & T for the cost-based rate. Thus, if AT & T purchases a series of network elements that is then combined to recreate a service offered by BellSouth, AT & T cannot simply supply its own operator services and claim entitlement to cost-based rates.

AT & T Communications of the Southern States, Inc. v. BellSouth Telecomm., Inc., 7 F. Supp. 2d 661, 669 (E.D.N.C. 1998). The NCUC interpretation thus permitted AT & T to avoid wholesale rates only by utilizing its own facilities in the network.

Although provisions of the interconnection agreement, including Paragraph 1.A, were arbitrated, section 251(a) of the 1996 Act authorizes parties to voluntarily negotiate provisions "without regard to the standards set forth in subsections (b) and (c) of section 251." AT & T contended below, as it does here, that Paragraph 30.5 of its interconnection agreement is a provision that has been negotiated "without regard" to the 1996 Act and law thereunder. That paragraph provides:

> BellSouth shall offer each Network Element individually and in combination with any other Network Element or Network Elements in order to permit AT & T to provide Telecommunications Services to its Customers subject to Section 1.A of the General Terms and Conditions of this Agreement.

8

J.A. 13. Paragraph 30.5 effectively obligates BellSouth, when so requested by AT & T, to offer each network element in unbundled form and to recombine network elements that have been unbundled.

The NCUC initially issued a Recommended Arbitration Order in December 1996, and, following the receipt of comments from the parties, it issued its final order in April 1997. Within the next month, the parties signed the interconnection agreement, incorporating both arbitrated and negotiated terms, and submitted it for approval to the NCUC. The NCUC approved the signed interconnection agreement on May 12, 1997. AT & T then filed this suit in district court, seeking federal review of the interconnection agreement under 47 U.S.C. § 252(e)(6).[2]

D.

Meanwhile, many companies and other affected parties were challenging the FCC's rules in various courts of appeals around the country. Ultimately, the Judicial Panel on Multidistrict Litigation consolidated these challenges in the Court of Appeals for the Eighth Circuit. See Iowa Utils. Bd. v. FCC, 109 F.3d 418, 421 (8th Cir. 1996). In July 1997, after AT & T filed this suit but before the district court rendered its decision, the Eighth Circuit issued its ruling in the consolidated appeals -- striking down some provisions and upholding others. See Iowa Utils. Board v. FCC, 120 F.3d 753, 800, 804, 805-806 (8th Cir. 1997) ("consolidated decision"). Two rulings in the Eighth Circuit's consolidated decision are apposite here. First, the Eighth Circuit upheld the FCC's "all elements" rule, concluding that a CLEC "could reproduce, under [47 U.S.C.§ 251](c)(3), an existing telecommunications service in its entirety solely by purchasing and combining unbundled network elements from an ILEC." 7 F. Supp. 2d at 669 (citing Iowa Utils., 120 F.3d at 814).

_____

[2] 47 U.S.C. § 252(e)(6) provides, in pertinent part: "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section."

Second, the Eighth Circuit struck down the FCC's interpretation of section 251(c)(3) that had obligated the ILEC to recombine network elements purchased on an unbundled basis under section 251(c)(3). Instead, the Eighth Circuit interpreted section 251(c)(3) to "unambiguously" indicate that the CLEC bore this obligation of recombination:

> Despite the Commission's arguments, the plain meaning of the Act indicates that the requesting carriers will combine the unbundled elements themselves; the Act does not require the incumbent LECs to do all of the work. Moreover, the fact that the incumbent LECs object to this rule indicates to us that they would rather allow entrants access to their networks than have to rebundle the unbundled elements for them.

120 F.3d at 813.

E.

When the district court considered AT & T's various challenges to the NCUC's determinations, it was operating under the law as construed by the Eighth Circuit in its 1997 consolidated decision. For our purposes here, two aspects of the district court's application of the Eighth Circuit's consolidated decision are relevant. First, the district court determined that the effect of the Eighth Circuit's ruling was that Paragraph 1.A, which required that AT & T pay wholesale rates unless it owned some part of the network, was no longer a proper application of the 1996 Act:

> As is correctly argued by AT & T, this approach flies in the face of the letter and intent of the Act as well as the Iowa Utilities ruling of the Eighth Circuit. That court held that "[n]othing in [(c)(3)] requires a competing carrier to own or control some portion of a telecommunications network before being able to purchase unbundled elements." Iowa, 120 F.3d at 814. As such, the court endorsed the FCC position that a requesting carrier could reproduce, under (c)(3), an existing telecommunication service in its entirety solely by purchasing and combining unbundled network elements

10

> from an ILEC. The NCUC's decision, reflected in Paragraph 1.A is not a proper application of the Act, and will therefore be struck down.

7 F. Supp. 2d at 669 (brackets in original).

Second, the district court struck Paragraph 30.5 from the interconnection agreement:

> This court will not allow AT & T to have its cake and eat it too. Section 30.5 of the agreement was negotiated and settled upon by the NCUC before the FCC's requirement that the ILECs combine unbundled elements for the requesting carriers was struck down by <u>Iowa Utilities</u>. The court emphasized that (c)(3) cannot "be read to levy a duty on the incumbent LECs to do the actual combining of elements. . . . [T]he plain meaning of the Act indicates that the requesting carriers will combine the unbundled elements themselves; the Act does not require the incumbent LECs to do all of the work." <u>Iowa Utilities</u>, 120 F.3d at 813. It would stretch the bounds of imagination to construe Paragraph 30.5 as a voluntary agreement to override § 251(c)(3). At the time of the Agreement, BellSouth was merely adhering to established FCC rules that § 251(c)(3) compels an ILEC to combine purchased network elements. Paragraph 1.A is invalid because it requires AT & T to do something it does not have to do under the Act. Paragraph 30.5 is suspect because it requires BellSouth to do the same.

<u>Id.</u> at 670 (brackets in original).

F.

When the district court issued its May 1998 decision in this case, however, the Supreme Court had already granted certiorari, on January 26, 1998, to review the Eighth Circuit's 1997 consolidated decision. <u>See AT & T Corp. v. Iowa Utils. Bd.</u>, 522 U.S. 1089, 1089 (1998). At that time, this appeal had been noticed, and we agreed to hold the appeal in abeyance pending the Supreme Court's decision.

In January 1999, seven months after the district court issued its decision here, the Supreme Court rendered its decision in the Iowa Utilities case, affirming in part and reversing in part the 1997 consolidated decision of the Eighth Circuit. See 525 U.S. at 392-96. Among other things, the Court vacated Rule 319. See supra at 5. The Court determined that the FCC had not properly applied the"necessary and impair" standards when it had mandated, in Rule 319, CLEC access to the seven elements of the ILEC's existing network; therefore, the Court remanded for the FCC to reinterpret the statute. 525 U.S. at 387-88. In light of its vacature of Rule 319, the Court noted that its disposition of two other rules -- the "all elements" rule and Rule 315(b)**3** -- was likely "academic." 525 U.S. at 392-93. Nonetheless, the Court upheld the "all elements" rule, noting that nothing in the 1996 Act required a CLEC to own any of the elements. Id. Further, the Court upheld Rule 315(b), ruling that section 251(c)(3)"is ambiguous on whether leased network elements may or must be separated." 525 U.S. at 395. Thus, the FCC's rule, which prohibited ILECs from disconnecting previously connected elements unless so requested, was upheld as reasonable. Id.

G.

Following the Supreme Court decision in Iowa Utilities, we ordered briefing of the issues and calendared this case for oral argument. Both parties now agree that a remand to the district court is in order; the sole disagreement is whether the district court erred in striking Paragraph 30.5 from the interconnection agreement.

II.

At bottom, BellSouth seeks to thwart what has been called "sham unbundling." According to BellSouth, if AT & T can: (1) unbundle the entire network; (2) have BellSouth recombine each element; (3) lease each of the elements without a requirement that it own any part thereof; and (4) still pay cost rates for this unbundled network, then AT & T will have rendered a nullity the provisions of the 1996 Act mandating wholesale rates under certain circumstances. In other

_____

**3 See supra** 5-7.

words, rather than paying the wholesale (higher) rates for use of the incumbent's network, the CLEC can unbundle the entire network, have BellSouth recombine it, and pay cost (lower) rates.

Under the NCUC's application of then-existing law to this interconnection agreement, sham unbundling was avoided by, among other things, applying wholesale rates when a CLEC leased a service already provided by the ILEC. Subsequently, when the district court decided this case, sham unbundling was avoided by requiring the CLEC to recombine elements that had been unbundled. As has been noted, the Eight Circuit's interpretation of the 1996 Act was not entirely in accord with that ultimately adopted by the Supreme Court, inasmuch as the Supreme Court vacated Rule 319, yet upheld Rule 315(b). We have fully considered the positions of the parties, and we believe that the district court is in the best position to determine the effect of the Supreme Court's decision on the interconnection agreement here. We therefore remand the case for reconsideration in light of the Supreme Court's interpretation of the 1996 Act and any other relevant authority.

AT & T requests that we order the reinstatement of Paragraph 30.5. We decline to do so. AT & T is correct that the 1996 Act permits parties to negotiate -- rather than arbitrate -- provisions of their interconnection agreement; however, provisions not arbitrated are also not necessarily negotiated "without regard to the standards set forth in subsections (b) and (c) of section 251." 47 U.S.C. § 252(a)(1). That is, the 1996 Act requires both the ILEC and CLECs to negotiate in good faith. See 47 U.S.C. § 251(c)(1). When the parties are so negotiating, many of their disputes will have been previously resolved by, among other things, FCC Rules and interpretations, prior state commission rulings and interpretations, and agreements reached with other CLECs -- all of which are a matter of public record. See, e.g., 47 U.S.C. § 252(i). In this light, many so-called "negotiated" provisions represent nothing more than an attempt to comply with the requirements of the 1996 Act.

For example, if a particular provision is mandated by the 1996 Act, the FCC rules or regulations, or some application thereof, then a party might agree to that provision without resort to arbitration. Such an agreement, which would occur without arbitration, is not necessarily

13

"without regard" to the 1996 Act and law thereunder. In other words, some provisions may be negotiated and agreed upon"with regard" to the 1996 Act and law thereunder, and provisions so negotiated and agreed upon may be reformed if the controlling law changes. Indeed, were it otherwise, parties would have an incentive to submit each issue to arbitration, so that if there were a change in controlling law, the provision would be so reformed. We decline to so encourage arbitration at the expense of negotiation.

Where a provision plainly tracks the controlling law, there is a strong presumption that the provision was negotiated with regard to the 1996 Act and controlling law. In this case, for example, we agree with the district court that, based on a comparison of Paragraph 30.5 with the interpretation of section 251(c)(3) that controlled when Paragraph 30.5 was negotiated, "[i]t would stretch the bounds of imagination to construe Paragraph 30.5 as a voluntary agreement to override § 251(c)(3)." 7 F. Supp. 2d at 670. Because Paragraph 30.5 was clearly negotiated with regard to the 1996 Act and law thereunder, we need not consider what other factors should be considered in determining whether a negotiated provision was agreed-upon "with" or "without" regard to the 1996 Act and law thereunder.

We also reject AT & T's argument that the vacature of Rule 319 is irrelevant, as a matter of law, to the propriety of Paragraph 30.5. The Court did uphold both the "all elements" rule and Rule 315(b), see 525 U.S. at 392-95; however, in doing so, it noted that ILECs concerns with those Rules would likely be "academic" in light of the vacature of Rule 319. This is so because "[i]f the FCC on remand makes fewer network elements unconditionally available through the unbundling requirement, an entrant will no longer be able to lease every component of the network." 525 U.S. at 392. In other words, the sham unbundling issue raised by the ILECs could be obviated by the FCC's successor to the vacated Rule 319. The Supreme Court thus indicated that its vacature of Rule 319 may void the sham unbundling problem, and based on this indication, we decline to conclude that the Supreme Court's decision is irrelevant to the district court's consideration of Paragraph 30.5.

In sum, we conclude that Paragraph 30.5, although negotiated, may be reviewed by the district court for consistency with the 1996 Act

14

and law thereunder. We express no opinion on what effect the changes in law might have on the district court's order to strike[4] Paragraph 30.5; instead, we remand for the district court to reconsider the issue.

REMANDED

_____

[4] We reject AT & T's contention that the district court was without power to order Paragraph 30.5 to be stricken; that authority was within the inherent power of the court. See Eden Hannon & Co. v. Sumitomo Trust & Banking Co., 914 F.2d 556, 564 (4th Cir. 1990) ("[T]he court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.").

15