U S WEST COMMUNICATIONS, INC.,
a Colorado corporation, Plaintiff,

v.

Robert J. HIX, et al., Defendants.

No. 97–D–152.

United States District Court,
D. Colorado.

June 23, 2000.

**1250**

Russell Paul Rowe, Davis, Graham & Stubbs LLP, Denver, CO, William M. Ojile, Jr., Colleen M. Rea, Evergreen, CO, Bobbee J. Musgrave, B. Lawrence Theis, Perkins Coie LLP, Steven Harold Denman, Richard L. Corbetta, Melissa A. O'Leary, Denman & Corbetta PC, Michael Craig Thompson, Quest Communications International, Inc., Denver, CO, Theodore C. Hirt, U.S. Department of Justice Civil Division, Washington, DC, Martha Hirschfield, Linda Ann Surbaugh, United States Attorney's Office, Denver, CO, for Plaintiff.

David Alexander Beckett, Attorney General's Office, Denver, CO, Anthony Marquez, Attorney General's Office, Denver, CO, Robert M. Pomeroy, Jr., Marcy Geoffrey Glenn, Holland & Hart, LLP, United States District Court, Denver, CO, Michael D. Warden, Sidley, Austin, Brown & Wood, Washington, DC, Joseph W. Halpern, Holland & Hart, LLP, Greenwood Village, CO, Paul Michael Gordon, Wendell Hume Goddard, Gordon & Goddard LLP, Oakland, CA, David R. DeMuro, Vaughan & DeMuro, Denver, CO, Deborah S. Waldbaum, AT & T Corporation, Pleasanton, CA, Anne Baudino Holton, Attorney General's Office, Denver, CO, Craig D. Joyce, Walters & Joyce, P.C., Denver, CO, Albert H. Kramer, David Blair Killalea, Dickstein, Shapiro, Morin & Oshinsky, Washington, DC, Charles B. Hecht, Hamil/Hecht, LLC, Denver, CO, Darryl M. Bradford, Kristina M. Entner, John Russell Harrington, Jenner & Block, Chicago, IL, Mark Brian Ehrlich, Mark Brian Ehrlich, Washington, DC, Letty S.D. Frieson, Ireland, Stapleton, Pryor & Pascoe, P.C., United States District Court, Denver, CO, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL, District Judge.

THIS MATTER arises under Sections 251 and 252 of the Telecommunications Act of 1996, 47 U.S.C. §§ 251 and 252 ("the Telco Act" or "the Act"). A hearing was held on September 22, 1998, in connection with issues concerning the merits of this case. The Court, being fully advised in the premises, hereby issues its Findings of Fact and Conclusions of Law in regard to certain of the issues argued at the hearing.

### I. ISSUES WITHDRAWN BY U S WEST COMMUNICATIONS, INC. ("USWC")

The Court first addresses USWC's Notice of Withdrawal of Moot Claims filed April 5, 2000. In this pleading, USWC seeks to withdraw a number of issues as moot given certain changes in the law since the hearing held in September, 1998. The Court **DENIES** USWC's request to withdraw the challenge in the First Claim

for Relief in 97–D–152, 97–D–1667, and 97–D–2096 that USWC not separate network elements that are currently combined in its network, because the Court spent time analyzing this issue before the filing of the Notice and has ruled on the merits of same in a separate Order issued previously. Moreover, the Court **DENIES** USWC's request to withdraw that portion of the Twelfth Claim for Relief in 97–D–2096 that addresses the unbundling of dark fiber for the same reason.

However, the Notice also seeks to withdraw a number of other claims which the Court finds should be allowed. Accordingly, the Court **GRANTS** USWC's request to withdraw the following claims, and these claims are **DISMISSED** to the extent set forth below:

A. Second Claim for Relief in Civil Action Numbers 97–D–152, 97–D–1667 and 97–D–2096 regarding the "most favored nations" provision of the agreement to the extent that USWC argued that the competitive local exchange carriers ("CLECs") should not be allowed to "pick and choose" provisions in other CLECs' interconnection agreements. The Supreme Court in *AT & T Corp. v. Iowa Utils., Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) upheld the FCC's "pick and choose" rule. USWC maintains the right to challenge the agreements to the extent they permit CLECs to opt into tariff provisions.

B. Third Claim for Relief in 97–D–152, 97–D–1667, and 97–D–2096 regarding restrictions on resale of services, to the extent that it challenges provisions requiring USWC to resell services already subject to wholesale discounts. However, USWC maintains the right to challenge the agreements to the extent they require USWC to resell services that are not "telecommunications services" such as enhanced services and inside wiring.

C. Seventh Claim for Relief in 97–D–152, Fifth Claim for Relief in 97–D–1667, and Sixth Claim for Relief in 97–D–2096 to the extent that they challenge the agreements' requirement to sell unregulated and deregulated services. However, USWC maintains the right to challenge the agreements to the extent that they require USWC to resell services that are not "telecommunications services."

D. Sixth Claim for Relief in 97–D–152 and Fifth Claim for Relief in 97–D–2096 to the extent that they challenge provisions of the agreements that require USWC to permit collocation at its "premises." However, USWC maintains the right to challenge the agreements to the extent that they allow the CLECs to determine whether their equipment may be collocated on USWC's premises, subject to the Court reviewing any waiver arguments on this issue. USWC also maintains the right to challenge those provisions of the agreements that permit those CLECs to collocate remote switching units ("RSU's") or other equipment that is not "necessary" for interconnection or access to unbundled elements, again subject to any waiver arguments by the CLECs.

E. Tenth Claim for Relief in 97–D–152 relating to "bill and keep" mechanism for recovery of transport and termination costs, and this claim is DISMISSED IN ITS ENTIRETY.

F. Eleventh Claim for Relief in 97–D–152 and Seventh Claim for Relief in 97–D–1667 relating to the division of access charges, and these claims are DISMISSED IN THEIR ENTIRETY.

G. Twelfth Claim for Relief in 97–D–152, Eighth Claim for Relief in 97–D–1667 and Fourteenth Claim for Relief in 97–D–2096 relating to denial of due process, and these claims are DISMISSED IN THEIR ENTIRETY.

H. Twelfth Claim for Relief in 97–D–2096 to the extent that it relates to unbundling of vertical switching features. However, USWC retains the right to challenge that unbundling of vertical switching features is only required where USWC must provide switching services.

## II. USWC's CHALLENGE TO RESTRICTIONS ON RESALE OF SERVICES (TELECOMMUNICATIONS SERVICES)

### A. Findings of Fact

1. USWC challenges provisions of the AT & T, MCI, TCG, Sprint and MFS interconnection agreements that require it to resell retail services that are not "telecommunications services." [1]

2. Specifically, USWC challenges Attachment 2, § 1.2 in its interconnection agreements with AT & T and MCI, which requires USWC to make available for resale:

> all retail Telecommunications Services USWC currently provides, or may offer hereafter, including, but not limited to, non-tariffed services, deregulated services which are offered at retail which qualify as Telecommunications Services, grandfathered service contract services, packaged services, residential services, business services, services offered on an individual case basis, discounted services, ancillary services, and promotional offerings where offered for a period of greater than ninety days. This description of services is neither all inclusive

nor exclusive. Specific services offered for resale shall also include, Centrex, Optional Calling Plans, Voice Mail, Inside Wire Maintenance, and Custom Calling Services.

Joint Appendix ("J.A.") Volume ("Vol.") 13, Tab 128, at Record ("R.") 26188; *id.* Tab 126, at R. 25041.

3. USWC challenges § 31.2.5.5 of the Sprint agreement which requires that USWC "offer all deregulated services to Sprint at a discount for resale." J.A. Vol. 11, Tab 112, at R. 1644.

4. As to MFS, although USWC does not assert what provision of the agreement is implicated, the Court notes that Section XXX provides that "USWC Basic Exchange Telecommunications Service ... will be available for resale from USWC ....". J.A. Vol. 12, Tab 120, at R. 05859.

### B. Conclusions of Law

1. Section 251 requires USWC "to offer for resale at wholesale rates any *telecommunications service* that [USWC] provides at retail to subscribers who are not telecommunications carriers ...." 47 U.S.C. § 251(c)(4) (emphasis added).

■ 2. The Court finds that enhanced services are not "telecommunications services" subject to regulation under Title II of the 1934 Communications Act. *See Amendment of § 64.702 of the Commission's Rules (Second Computer Inquiry),* 0080 WL 233301, 77 F.C.C.2d 384, 428 (1980), *modified on recon.,* 84 F.C.C.2d 50,

---

1. The Court finds that this claim is not properly asserted as to TCG because this claim was not asserted against it in the First Amended Complaint in Civil Action No. 97–D–152. The claim was asserted in that complaint only as to MFS. After TCG demonstrated that this claim was not properly before this Court, USWC responded with a motion for constructive amendment of the pleadings to assert the claim against TCG. The Court denied that motion; thus, this claim does not exist against TCG. As to WorldCom, although the issue was not originally briefed as to MFS, USWC did assert this claim against MFS in its First Amended Complaint in 97–D–152 in the third and seventh claims for relief. Thus, the Court finds that this claim is properly asserted against MFS. For future reference, WorldCom has been substituted for MFS in this proceeding.

39 P.U.R.4th 319 (1980), *further modified on recon.*, 1981 WL 158727, 88 F.C.C.2d 512 (1981), *aff'd sub nom., Computer & Communications Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C.Cir.1982); Memorandum Opinion and Order, *Petition for Emergency Relief & Declaratory Ruling Filed by Bell South Corp.*, 7 FCC Rcd 1619 (1992), *aff'd sub nom., Georgia Pub. Serv. Comm'n v. FCC*, 5 F.3d 1499 (11th Cir. 1993); *see also* 47 C.F.R. § 64.702(a).

3. This distinction is preserved in the Telco Act: it defines "information services" separately from "telecommunications services," 47 U.S.C. §§ 153(20) and (43), and the FCC has expressly stated that all services previously considered to be "enhanced services" are "information services" under the Act. *E.g.*, First Report and Order and Further Notice of Proposed Rulemaking, *IMPLEMENTATION OF THE TELECOMMUNICATIONS ACT OF 1996: TELEMESSAGING, ELECTRONIC PUBLISHING, AND ALARM MONITORING SERVICES*, 1997 WL 49613, 12 FCC Rcd 5361 (1997). The *Local Competition Order* also indicates that enhanced services are not "telecommunications services." First Report and Order, *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket Nos. 96–98 *et al.*, 11 FCC Rcd 15499 ¶ 581 n. 1416 (1996) ("*Local Competition Order*").

4. The FCC has reiterated this conclusion in its orders addressing applications of Bell Operating Company to provide in-region long distance service under 47 U.S.C. § 271. In its Memorandum Opinion and Order on BellSouth's second application to provide in-region long distance service in Louisiana, the FCC confirmed that "information services" are synonymous with "enhanced services" and that voicemail is an "enhanced service." Memorandum Opinion and Order, *Application of BellSouth Corporation, BellSouth Telecommunications, Inc., and BellSouth Long Distance, Inc., for Provision of In-Region, InterLATA Services in Louisiana*, 13 FCC Rcd 20599 ¶ 314 (1998) ("*BellSouth Louisiana II*") (citing other FCC authority). The FCC further reiterated that the definitions of "information services" and "telecommunications services" are "mutually exclusive," *id.*; therefore, an incumbent local exchange carrier ("ILEC") is not required to resell any service that is an "enhanced" or "information" service or that is otherwise not a "telecommunications service." *Id.*

5. The FCC has also concluded that "inside wire maintenance" is not a "telecommunications service" under the Act. For example, in its Second Report and Order in CC Docket No. 97–21; Third Order on Reconsideration in CC Docket No. 97–21; Sixth Order on Reconsideration in CC Docket No. 96–45, *Changes to the Board of Directions of the National Exchange Carrier Association, Inc.; Federal–State Joint Board on Universal Service*, CC Docket No. 97–21 and 96–45, 13 FCC Rcd 22908 (Nov. 4, 1998), the FCC held:

> We conclude that inside wiring maintenance—the maintenance of telephone plant—*does not constitute telecommunications or a telecommunications service* because it does not involve the "transmission" of information.

*Id.*, ¶ 5 (emphasis added); Second Report and Order and Further Notice of Proposed Rulemaking, *Implementation of the Telecommunications Act of 1996*, CC Docket Nos. 96–115 and 96–149, 13 FCC Rcd 8061 ¶ 45 (Feb. 26, 1998) ("[I]nside wiring, CPE [customer premises equipment], and information services do not fall within the scope of section 222(c)(1)(A) because they are not 'telecommunications services' "); *see also* 47 U.S.C. § 153(46) (defining "telecommu-

nications service" as the transmission of information).

6. Several courts have also held that ILECs are not required to resell "information services," such as voicemail, inside wire or inside wire services. *See, e.g., U S WEST Communications, Inc. v. Garvey,* File No. Civ. 97–913 ADM/AJB, slip op. at 30–31 (D.Minn. Mar. 30, 1999); *U S West Communications, Inc. v. Thoms,* 1999 WL 33456553, \*27–28 (S.D.Iowa Jan. 25, 1999).

7. The Court agrees with the reasoning of the decisions of the Minnesota and Iowa districts courts as well as the clear pronouncements of the FCC and holds the Colorado Public Utilities Commission ("CPUC" or "Commission") ERRED in requiring USWC to resell "enhanced" or "informational" services, such as voicemail and inside wire maintenance. Accordingly, those provisions of the AT & T, MCI, Sprint and MFS agreements that can be construed to require USWC to resell "enhanced" or "information" services and inside wire maintenance VIOLATE the Act and are VACATED. Judgment shall be entered in favor of USWC and against AT & T, MCI, Sprint and MFS/WorldCom on the portions of the Third and Seventh Claims for Relief in 97–D–152, the Fifth Claim for Relief in 97–D–1667, and the Third and Sixth Claims for Relief in 97–D–2096 that require USWC to provide "telecommunications services" in the form of "enhanced" or "informational" services or inside wire maintenance.

## III. *AT & T'S RESALE ARGUMENT REGARDING CONTRACT SERVICE ARRANGEMENTS ("CSAs")*

### A. *Findings of Fact*

1. Contract service arrangements ("CSAs") are " 'contractual agreements made between a carrier and a specific, typically high-volume, customer, tailored to that customer's individual needs.' " *AT*

*& T Communications of Southern States, Inc. v. BellSouth Telecomm., Inc.,* 7 F.Supp.2d 661, 670–71 (E.D.N.C.1998) (quoting Memorandum of the FCC as *Amicus Curiae,* at 15.) In other words, "CSAs are simply contracts between [the ILEC] and a specific customer that are formulated to meet the special needs of that customer." *Id.* at 671.

2. The CPUC ruled that USWC need not sell retail telecommunications services packaged as CSAs (or individual case-based contracts) to AT & T at a wholesale discount. Order Approving Application Regarding Interconnection Agreement with Modifications, Docket No. 96A–345T, Decision No. C97–857 (Aug. 20, 1997) (J.A. Vol. 10, Tab 98, at 24976–77). AT & T challenges Section 4.6.2 of Attachment 2 to the USWC–AT & T Agreement, which provides that "AT & T can utilize, under the same terms and conditions, any volume discounts that USWC makes available to its end user customers." USWC–AT & T Agr., Att. 2, § 4.6.2 (J.A. Vol. 13, Tab 126, at 25045). AT & T asserts, in part, that it is the absence of a provision permitting AT & T to resell CSAs that violates the Act.

3. AT & T argues the decision by the CPUC and the corresponding provision of the Agreement violate the Act and FCC rules by excusing USWC from its obligation to provide to AT & T CSAs for resale at a wholesale rate under section 251(c)(4)(A) of the Act and the *Local Competition Order.* Also, AT & T asserts that the CPUC's decision and the salient provision of the Agreement impose an unreasonable restriction on resale of telecommunications services in violation of section 251(c)(4)(B) of the Act. USWC contends that the Act only requires the resale of retail services at a discount, which retail services are defined as those covered by the tariffs filed by the ILECs. CSAs are not found in the USWC tariffs and are not

thus not subject to resale at wholesale prices according to USWC.

### B. *Conclusions of Law*

█ 1. The CPUC's ruling that USWC need not sell retail telecommunications services packaged as CSAs to AT & T at a wholesale discount and the Agreement's corresponding provisions are a result of the CPUC's legal interpretation of the Telco Act and the FCC's rules, and specifically the *Local Competition Order.* This issue is therefore subject to *de novo* review. *U S West Communications, Inc. v. Hix,* 986 F.Supp. 13, 19 (D.Colo.1997).

2. Section 251(c)(4)(A) of the Telco Act requires USWC "to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A); *see also* 47 C.F.R. § 51.605(a). The Telco Act defines "telecommunications service" broadly as "the offering of telecommunications for a fee directly to the public.…" 47 U.S.C. § 153(46). The Telco Act in turn defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). Moreover, the Telco Act specifies that wholesale rates are determined "on the basis of retail rates charge[d] to subscribers for the … service[s] requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier." 47 U.S.C. § 252(d)(3).

3. The FCC has ruled that the obligation to offer telecommunications services to resellers at wholesale rates applies whether the service is provided at retail on a general or, as in the case of contract offerings, a customer-specific basis. *Local*

*Competition Order* ¶ 943. Rejecting the incumbents' contrary "conten[tion] that section 251(c)(4) resale obligations should not apply to contract … offerings," *id.* ¶ 943 & n. 2231 (citing comments of the United States Telephone Association, a coalition of ILECs), the FCC ruled that section 251(c)(4)(A) "makes no exception for promotional or discounted offerings, including *contract* and other customer-specific offerings." *Id.* ¶ 948 (emphasis added); *see also id.* ¶ 951 ("[i]f a service is sold to end users, it is a retail service, even if it is priced as a volume-based discount off the price of another retail service"). The FCC concluded that "no basis exists for creating a general exemption from the wholesale requirement" for any particular type of telecommunications service. *Id.* at 948. The Eighth Circuit sustained the FCC's comments as "reasonable interpretations of the Act." *Iowa Utils. Bd. v. Federal Communications Comm'n,* 120 F.3d 753, 819 (8th Cir.1997).

4. Exempting incumbents such as USWC from their resale obligation regarding CSAs "would permit incumbent LECs to avoid the statutory resale obligation by shifting their customers to nonstandard [*i.e.,* customer-specific] offerings, thereby eviscerating the resale provisions of the 1996 Act." *Local Competition Order* ¶ 948; *see also id.* ¶ 956 ("[g]iven the goal of the 1996 Act to encourage competition, we decline to limit the resale obligation with respect to certain services where the 1996 Act does not specifically do so").

5. Indeed, the FCC has specifically confirmed that the argument advanced below by USWC and accepted by the CPUC—that CSAs need not be provided at a wholesale discount because they are already discounted—is contrary to the language and purpose of section 251(c)(4)(A) and the *Local Competition Order* as upheld by the Eighth Circuit. *See In re*

*Application of BellSouth Corporation, et al. Pursuant to Section 271 of the Communications Act of 1934, as amended, To Provide In–Region, InterLATA Services In South Carolina,* FCC 97–418, CC Docket No. 97–208, Memorandum Opinion and Order ¶ 217 (Dec. 24, 1997) (*"BellSouth South Carolina Order"*). In that decision, the FCC held that the refusal to sell CSAs using a wholesale discount "impedes competition for [an incumbent's] large-volume customers and thus impairs the use of resale as a vehicle for competitors to enter [the local] market." *Id.,* ¶ 215. The FCC also specifically addressed and rejected the reasoning employed by the CPUC by stating that "any service sold to end users is a retail service, and thus is subject to the wholesale discount requirement, even if it is already priced at a discount off the price of another retail service." *Id.,* ¶ 217.

6. The FCC's holding that CSAs are subject to resale at a wholesale rate pursuant to section 251(c)(4)(A) of the Act may not be challenged in this section 252(e)(6) appeal. *See Southwestern Bell Telephone Co. v. AT & T Communications, Inc.,* No. A–97–CA–132–SS, 1998 WL 657717, at *1 (W.D.Tex. Aug. 31, 1998); *AT & T Communications Inc. v. Pacific Bell,* C–97–0080, 1998 WL 246652, at *2 (N.D.Cal. May 11, 1998); *see also Fed. Communications Comm'n v. ITT World Communications, Inc.,* 466 U.S. 463, 468, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984) (holding that Courts of Appeal have exclusive jurisdiction to review FCC orders).

7. One other federal court has rejected the very argument advanced here by USWC, holding that CSAs must be made available for resale to CLECs at the wholesale rate. *See AT & T Communications of Southern States, Inc. v. BellSouth Telecomm., Inc.,* 7 F.Supp.2d 661, 672–74 (E.D.N.C.1998). ("[T]he notion that CSAs are likely already discounted is not suffi-

cient to remove them from the Act's clear mandate"). *Id.* at 672. The Court finds the reasoning in this case persuasive and adopts it herein.

8. Moreover, Section 251(c)(4)(B) of the Telco Act forbids ILECs from "impos[ing] unreasonable or discriminatory conditions or limitations on ... the resale of [retail] services." Recognizing that restrictions on resale "may reflect an attempt by [ILECs] to preserve their market position" to the detriment of competition and the interests of consumers, the FCC has "conclud[ed] that ... resale restrictions are [presumptively] unreasonable" and "therefore in violation of § 251(c)(4)." *Local Competition Order* ¶ 939. An "[ILEC] can rebut this presumption," *id.,* but "only if it proves to the state commission that the restriction is reasonable and nondiscriminatory." 47 C.F.R. § 51.613(b); *see also AT & T Communications Inc. v. Pacific Bell,* C–97–0080, 1998 WL 246652, at *14–15 (N.D.Cal. May 11, 1998); *BellSouth South Carolina Order* ¶¶ 217–218.

9. The FCC has made clear that this nondiscrimination regulation "does not contemplate ... that a state commission can create a general exemption of all CSAs from the Act's requirement that retail offerings be available for resale at a discount from the retail price." *BellSouth South Carolina Order* ¶ 218. Rather, the state commission must employ the presumption of unreasonableness in its review, and the incumbent has the burden of overcoming that presumption. *See Pacific Bell,* 1998 WL 246652, at *14–15. Here, USWC did not attempt to rebut the presumption of unreasonableness, and the CPUC did not state whether or how its general restriction on all CSAs overcomes the presumption of unreasonableness. Accordingly, the CPUC's decision to exempt "individual case-based contracts," J.A. Vol. 10, Tab 98, at 24976–77, from the requirements of sec-

tion 251(c)(4)(A) was incorrect as a matter of law. *See BellSouth Telecomm.,* 7 F.Supp.2d at 672.

10. The Court rejects the argument made by USWC that the definition of retail service which must be provided at a discount applies only to retail services that are included in the tariffs filed by the ILEC. USWC cites to the *Local Competition Order,* ¶ 948 in support of this argument. However, ¶ 948 does not define retail service this way, or even discuss this issue. ¶ 939 of the *Local Competition Order* does state that resale restrictions "include conditions and limitations contained in the [ILECs'] underlying tariff." However, resale restrictions are not limited to those in the tariff. Instead, the FCC was simply clarifying that resale restrictions can actually be broader than those found in the resale agreement, and can *include* those in the tariff. *Id.*

11. In conclusion, the Court finds that the CPUC's decision to exempt individual contract-based offerings for resale and the corresponding provision of the USWC–AT & T Agreement VIOLATES the Act. Judgment shall enter in favor of AT & T on Count One of its Cross Claim and Counterclaim in Civil Action No. 97–D–2096, and this issue is REMANDED to the CPUC. The CPUC is directed to modify the USWC–AT & T Agreement to require USWC to offer to AT & T CSAs for resale at a wholesale discount.

## IV. *AT & T'S RESALE ARGUMENT REGARDING SHORT TERM PROMOTIONS (PROMOTIONS LASTING 90 DAYS OR LESS)*

### A. *Findings of Fact*

1. AT & T also challenges the USWC–AT & T Agreement's failure to permit AT & T to resell short-term promotions of 90 days or less. Although the Agreement requires USWC to make available for resale "promotional offerings where offered for a period of greater than ninety (90) days," USWC–AT & T Agr., Att. 2, § 1.2 (J.A. Vol 13, Tab 126, at 25041), there is no provision in that Agreement requiring USWC to offer promotions of 90 days or less for resale.

2. In the CPUC's order clarifying its approval of the USWC–AT & T Agreement, the CPUC stated that "[i]f a promotion (either called 'special' or 'market trial') is longer than 90 days, it shall be offered for resale." [2] However, the CPUC noted that this did not apply to "promotions under the 90–day time period."

3. When the CPUC approved the USWC–AT & T Agreement, it held that with respect to volume or term discounts the Agreement "should not conflict with our ruling in Docket No. 96S–331T." Order Approving Application Regarding Interconnection Agreement with Modifications, Docket No. 96A–345T, Decision No. C97–857 (Aug. 20, 1997) (J.A. Vol. 10, Tab 98, at 24976–77). The ruling in Docket No. 96S–331T states that "the [*Local Competition Order* ] requires the resale of all retail telecommunications services except for promotional offerings of less than ninety days in duration." Decision No. C97–739, Docket No. 96S–331T, ¶ 7(a)(1), at 83–84 (attached as Exhibit D to AT & T's Counterclaims).

4. AT & T contends that the CPUC erred as a matter of law by failing to require the resale of short-term promotions in direct conflict with the Telco

---

2. CPUC Decision Denying, in Part, and Granting, in Part, Applications for Rehearing, Reargument, or Reconsideration; Clarifying Commission Decision No. C96–1231; and Granting Extension of Time To File Interconnection Agreement, Docket No. 96A–345T, Decision No. C97–7 (Colo. PUC Jan. 15, 1997) (J.A. Vol 10, Tab 94, at 10524–10525).

Act and FCC rulings. AT & T argues that Sections 251(c)(4)(A) and 251(b)(1) of the Act and the interpreting regulations require that promotional offerings of 90 days or less must be made available for resale at the promotional rate. AT & T, recognizing the FCC's holding on this point, does not contend that it is entitled to a wholesale discount from the promotional rate.

5. USWC maintains that those short-term promotional offerings need not be offered for resale at all because promotional offerings of 90 days or less are not provided at retail rates, and thus they are not "telecommunications services that the carrier provides at retail." *See* USWC Response Brief at 28. Further, USWC argues that these promotions are not tariffed services, and are thus excluded from the resale obligation, that the FCC Rules are not clear whether these promotions need to be resold, and that the FCC Rules permit the states to restrict such promotions.

### B. *Conclusions of Law*

■ 1. Because this issue involves the CPUC's interpretation of the Act and FCC rules, it is subject to review *de novo.* *U S West Communications v. Hix,* 986 F.Supp. 13, 19 (D.Colo.1997).

2. Section 251(c)(4)(A) of the Act requires that USWC must "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A).

3. The *Local Competition Order* held that section 251(c)(4)(A)'s requirement that incumbent LECs must offer "any telecommunications service" for resale "makes no exception for promotional or discounted offerings." *Id.,* ¶ 948. It further stated, "[w]e therefore conclude that no basis exists for creating a general exemption from

the wholesale requirement for all promotional or discount service offerings made by incumbent LECs." *Id.* "A contrary result would permit [ILECs] to avoid the statutory resale obligation by shifting their customers to nonstandard offerings, thereby eviscerating the resale provisions of the 1996 Act." *Id.; see also* ¶ 956 ("[g]iven the goal of the 1996 Act to encourage competition, we decline to limit the resale obligation with respect to certain services where the 1996 Act does not specifically do so"). The FCC has reinforced the conclusion that "promotional offerings of less than 90 days, are ... retail services, and, therefore, must be made available for resale." Memorandum of the FCC as *Amicus Curiae,* at 18, *AT & T Communications of the Mountain States, Inc. v. Hix,* No. 97–D–152 (D.Colo. Mar. 3, 1998).

4. The FCC in the *Local Competition Order* went on to consider whether all short-term promotional prices are "retail rates" for purposes of calculating wholesale rates pursuant to section 252(d)(3). *Id.* ¶ 949. It concluded that "short-term promotional prices do not constitute retail rates for the underlying services and are thus not subject to the wholesale rate obligation." *Id.* "We therefore establish a presumption that promotional prices offered for a period of 90 days or less [the short-term promotions] need not be offered at a discount to resellers." *Id.* ¶ 950. "Promotional offerings greater than 90 days in duration must be offered for resale at wholesale rates pursuant to section 251(c)(4)(A)." In other words, the FCC did *not* hold that short-term promotional offerings are exempt from the resale requirements of section 251(c)(4), only that they do not have to be offered at the discounted wholesale rates. Finally, the FCC noted that it was "concerned that conditions that attach to promotions ... could be used to avoid the resale obligation

to the detriment of competition." *Id.* ¶ 952. "Allowing [ILECs] end user restrictions to be made automatically binding on reseller end users could further exacerbate the potential anticompetitive effect." *Id.*

5. However, the FCC concluded that "there may be reasonable restrictions on promotions ...." Specifically, it stated, "[w]e conclude that the substance and specificity of rules concerning which ... promotion restrictions may be applied to resellers in marketing their services to end users is a decision best left to state commissions." *Id.* The rule applied to volume discount offerings where the FCC concluded that restrictions were "presumptively unreasonable" (*id.* ¶ 253) was not applied by the FCC to short term promotions; thus, the FCC left it to the state commissions to fashion reasonable restrictions if they deemed them necessary.

6. The FCC regulations define more specifically what restrictions on resale can be imposed for short term promotions. 47 C.F.R. § 51.613(a)(2). The regulation permits certain restrictions as set forth in § 51.613(a), and then states, "[w]ith respect to any restrictions on resale not permitted under paragraph (a), an [ILEC] may impose a restriction only if it proves to the state commission that the restriction is reasonable and nondiscriminatory." *Id.,* § 51.613(b).

7. The Eighth Circuit specifically upheld the FCC's regulations. *Iowa Utils. Bd. v. Fed. Communications Comm'n,* 120 F.3d 753, 819 (8th Cir.1997). At least one federal court addressing this issue concluded that the state commission erred by not allowing promotional offerings lasting 90 days or less to be available to the new entrant for resale. *MCI Telecomm. Corp. v. BellSouth Telecomm., Inc.,* 7 F.Supp.2d 674, 682 (E.D.N.C.1998).

8. The Court finds that the CPUC's ruling that "the *Local Competition Order* requires the resale of all retail telecommunications services except for promotional offerings of less than ninety days in duration" is erroneous. As stated previously, promotional offerings of less than ninety days are not exempted from resale in the *Local Competition Order;* instead, the FCC stated only that these short-term promotions did not have to be offered at the discounted wholesale rate.

9. Further, although the FCC did rule that state commissions could impose reasonable restrictions on such short-term promotions, USWC has not shown that the CPUC imposed its restriction on resale of short-term promotional offerings in accordance with the restrictions allowed pursuant to 47 C.F.R. § 51.613(a). Moreover, USWC has not shown that the CPUC imposed its restriction on short-term promotions based on USWC's proof to the CPUC that the restriction is reasonable and nondiscriminatory in accordance with 47 C.F.R. § 51.613(b).

10. In this regard, USWC's Proposed Findings of Fact and Conclusions of Law on Issues under Advisement filed April 5, 2000 asserts that, "[e]xercising its discretion, the Commission properly found that precluding resale of short-term promotions of less than 90 days is 'procompetitive' and would 'outweigh any anticompetitive effects'", citing A206 at 21. When the Court was unable to find any record cite for "A206 at 21", it asked USWC to provide a copy of this portion of the record. In an Errata to Updated Proposed Findings of Fact and Conclusions of Law of USWC on Issues under Advisement filed April 17, 2000, USWC acknowledged that the citation to A206 at 21 was erroneous, and that the terms "procompetitive" and "outweigh any antidiscriminatory effects" contained in USWC's statement were not

made by the CPUC but by the FCC in its First Report and Order, ¶ 949.

11. However, USWC asserts that the CPUC did reference paragraph 949 of *Local Competition Order* in a footnote, and stated that the CPUC saw "no reason to adopt a view different from the FCC", citing the Decision Regarding Petition for Arbitration, Docket No. 96A–345T, Decision No. C96–1231 at R. 10388. The Court finds that this does not support USWC's position that the CPUC decided to impose reasonable restrictions on short-term promotions consistent with the FCC's Order. That is because the CPUC did not cite to the FCC Order in connection with finding that restrictions on resale of short-term promotions were justified as being "procompetitive" or for any other reason. Instead, the CPUC cited to the FCC Order in finding that promotions of up to 90 days do not establish retail rates for the underlying service subject to resale.

12. As stated previously, the FCC Order clearly does hold that short-term promotional prices do not constitute retail rates for the underlying services and are thus not subject to the wholesale rate obligation. However, this does not justify the CPUC's decision to disallow the CLECs to purchase short-term promotions altogether, without any justification for why such restriction was imposed, and which appears to be based on its mistaken belief that the *Local Competition Order* requires this absolute restriction on such promotions.

13. Accordingly, it is hereby ordered that the CPUC's decision exempting promotional offerings of 90 days or less VIOLATES the Act. Judgment shall be entered in favor of AT & T on Count Two of its Cross Claim and Counterclaim in Civil Action No. 97–D–2096 and against USWC, and this issue shall be REMANDED to the CPUC. The CPUC is directed to modi-fy the AT & T–USWC interconnection agreement to permit AT & T to obtain promotional offerings of 90 days or less at the retail rate specified in the *Local Competition Order.*

## V. COLLOCATION

### A. *Findings of Fact*

1. USWC challenges the interconnection agreements to the extent they allow the CLECs to determine where their equipment may be collocated on USWC's premises. USWC also challenges those provisions of the agreements regarding equipment those CLECs can collocate in USWC's central offices. Finally, USWC challenges the ability of CLECS to collocate remote switching units ("RSUs").

2. The USWC–AT & T and USWC–MCI Agreements provide that "[AT & T/MCI] may collocate the amount and type of equipment [they] deem[ ] necessary in [their] collocated space in accordance with FCC and Commission Rules and Regulations" and that "[s]uch equipment may include, but shall not be limited to, transmission equipment, multiplexing equipment and remote switching units, subject to availability of space." US West–AT & T Agr., Att. 5, § 1.5 (J.A. Vol. 13, Tab 126, at 25139); US West–MCI Agr., Att. 5, § 1.5 (J.A. Vol. 13, Tab 128, at 26286). Similarly, USWC asserts that the CPUC also allowed TCG to collocate RSU's on USWC's premises. R. 6753, Decision No. C96–1186 at p. 42 n. 37.

3. The CLECs argue that USWC waived or abandoned its right to assert any collocation argument other than the argument that CLECS should not be allowed to collocate RSUs. The Court agrees with the CLECs that USWC affirmatively stated at the hearing on this issue that the only argument it was pursuing in regard to collocation was the one regarding RSUs.

*See* Transcript of Hearing from September 22, 1998, p. 187, II. 12–20, p. 196, I. 23—p. 198, I. 5. Accordingly, the Court agrees that collocation issues other than collocation of RSUs were waived or abandoned by USWC. To the extent that USWC is continuing to assert such claims in its Updated Proposed Findings of Fact and Conclusions of Law filed with the Court on April 5, 2000, the Court will not consider them.

4. The issue whether USWC was required to permit collocation of RSUs was arbitrated before the CPUC. The CPUC concluded that it should allow collocation of RSUs based on the evidence before it. AT & T Arbitration Decision, at 57 (J.A. Vol. 10, Tab 93, at 10359); MCI Arbitration Decision, at 85 (J.A. Vol. 10, Tab. 103, at 11568).

5. USWC argues that the CPUC improperly permitted the collocation of RSUs because they are "switching" equipment and not "transmission" equipment. It cites no record support for that argument, however. The CLECS demonstrate that there was significant evidence in the record that RSUs perform transmission functions that are necessary for efficient interconnection, that collocating RSUs avoids problems with the quality of interconnection between the new entrants' and USWC's networks, that collocating RSUs allows customers within a given remote switch to complete calls to each other even if an "umbilical" line to a host switch is cut, and that without collocated RSUs, new entrants like AT & T and MCI would be competitively disadvantaged. *See* Direct Testimony of John P. Lynott, at 22–25, 33 (J.A. Vol. 9, Tab 67, at 22–25, 33); Supplemental Direct Testimony of John P. Lynott, at 17–19 (J.A. Vol. 7, Tab 27, at 9816–18); Exh. 7, Supplemental Direct Testimony of John P. Lynott, at 17–20 (J.A. Vol. 8, Tab 44, at 11937–40).

**B.  Conclusions of Law**

1.  Section 251(c)(6) of the Act imposes on U.S. West:

The duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of U.S. West, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

47 U.S.C. § 251(c)(6). Collocation refers to an "ILEC's obligation under the statute to permit CLECs to install equipment on the ILEC's property in order to connect to the ILEC's existing network." *MCI Telecommun. Corp. v. U.S. West Communications*, 204 F.3d 1262, 1269 (9th Cir.2000).

2. In its *Local Competition Order*, the FCC held that any "transmission equipment ... may be collocated," *id.* ¶ 580, and that "modern technology has tended to blur the line between switching equipment and multiplexing equipment, which we permit to be collocated." *Id.* ¶ 581. Therefore, the FCC left it to state commissions to "determine whether the equipment at issue is actually used for interconnection or access to unbundled elements" if the functionality of a particular piece of equipment is in dispute. *Id.* This question of fact is reviewed by the Court under the arbitrary and capricious standard. *See U S West Communications v. Hix*, 986 F.Supp. 13, 18 (D.Colo.1997). However, the Court reviews *de novo* any interpretations of the CPUC as to whether collocation of RSUs violate the Act. *Id.*

3. The Act permits collocation of equipment "necessary for interconnection or access to unbundled network elements."

§ 251(c)(6). FCC regulations provide that "[w]henever an incumbent LEC objects to collocation of equipment by a requesting telecommunications carrier for purposes within the scope of section 251(c)(6) of the Act, the incumbent LEC shall prove to the state commission that the equipment will not be actually used by the telecommunications carrier for the purpose of obtaining interconnection or access to unbundled network elements." 47 C.F.R. § 51.323(b).

4. In the *Local Competition Order*, the FCC held that "necessary" as used in section 251(c)(6) "does not mean 'indispensable,' but rather 'used' or 'useful.'" *Id.* ¶ 579. The FCC required that an "incumbent LEC shall prove to the state commission that such equipment is not 'necessary,' as [the FCC has] defined that term for interconnection or access to unbundled network elements." *Id.* ¶ 580. These regulations were affirmed by the Eighth Circuit. *See Iowa Utils. Bd. v. Fed. Communications Comm'n*, 120 F.3d 753, 819 n. 39 (8th Cir.1997). Consistent with the *Local Competition Order*, in its First Report and Order and Further Notice of Proposed Rulemaking, *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 14 FCC Rcd 4761 ¶ 28 (1999), the FCC ordered incumbent LECs to permit carriers to collocate equipment "used or useful" for interconnection.

5. The Supreme Court in *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), vacated the FCC's definition of the term "necessary" as it is found in another provision of the Act.[3] Further, the D.C. Circuit recently relied on the Supreme Court's decision in *AT & T Corp.* to vacate the subsequent

FCC order applying its definition of "necessary" in section 251(c)(6) as "used or useful." *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 422–24 (D.C.Cir. Mar.17, 2000).

6. However, the Ninth Circuit recently rejected USWC's argument that *AT & T Corp.* requires that a state commission decision allowing collocation of RSUs be vacated, noting that while "the Act may not require the provision [allowing collocation of RSUs], it certainly does not proscribe it." *MCI Telecommun. Corp. v. U.S. West Communications*, 204 F.3d 1262, 1269 (9th Cir.2000). The Ninth Circuit explained its holding as follows:

U S West argues that we must strike the provision because the WUTC relied on the FCC's interpretation of the word 'necessary,' an interpretation with which the Supreme Court has found fault. . . . Were we reviewing this agreement under the judicial review standards of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., we might agree with U S West that the agency's use of an improper definition of 'necessary' requires us to return the agreement to the agency for reconsideration . . . .

We are not reviewing the actions of a federal agency subject to the APA, however. Here, our task is not to examine possible flaws in the WUTC's decision-making process, but to decide whether a provision resulting from that process-the provision requiring co-location-has resulted in an agreement that fails to 'meet the requirements' of the Telecommunications Act. 47 U.S.C. § 252(e)(6). Although the Act may not require the provision [of the agreement requiring USWC to allow a CLEC to co-locate

---

**3.** The FCC had defined "necessary" in that other provision, which required the FCC to determine whether "access to such proprietary network elements as are proprietary in nature is necessary," as allowing access "re-

gardless of whether requesting carriers can obtain the requested proprietary element from a source other than" the ILEC. *AT & T Corp.*, 525 U.S. at 389, 119 S.Ct. 721.

RSUs], it certainly does not proscribe it. Sections 251 and 252 of the Act are designed to provide some flexibility in fixing the provisions of interconnection agreements. Hence, we conclude that the provision is valid and affirm the district court.

*Id.*

7. This Court finds the Ninth Circuit's reasoning persuasive, and adopts it herein. The Court further notes that the Fourth Circuit and certain district courts have also held after *AT & T Corp.* that ILECs like USWC should be required to allow collocation of RSUs. *See AT & T Communications v. Bell Atlantic–Virginia,* 197 F.3d 663, 669 (4th Cir.1999); *MCI Telecommunications v. Bell Atlantic–Pennsylvania,* No. 97–1857, Report & Recommendation (M.D.Pa. Sept. 16, 1999); *MCI v. Bell–Atlantic,* 36 F.Supp.2d 419 (D.D.C. 1999).

8. Finally, the Court finds that the D.C. Circuit's decision in *GTE Serv. Corp.* does not require that the CPUC's decision be vacated. While the D.C. Circuit did vacate the FCC's implementation of its definition of "necessary" as "used or useful," this does not change the fact that allowing collocation of RSUs does not violate the Act under the rationale adopted by the Ninth Circuit in *MCI Telecomm. Corp.,* 204 F.3d at 1269.

9. Moreover, the D.C. Circuit did not disturb the FCC's regulations placing the burden of proof on an ILEC to demonstrate that a particular piece of equipment is "necessary" for interconnection. USWC has cited no evidence that the CPUC acted in an arbitrary and capricious manner in concluding that USWC failed to meet its burden of showing that RSUs are not necessary for interconnection or access to unbundled network elements. There was significant evidence in the record supporting the CPUC's conclusion that RSUs should be collocated. *See* J.A. Vol. 7, Tab 27, at 9816–18; Vol. 8, Tab 44, at 11937–40; Vol. 9, Tab 67, at 22–25, 33.

10. Finally, at oral argument but not in its briefs, USWC asserted that the decision in *Bell Atlantic Tel. Cos. v. Fed. Communications Comm'n,* 24 F.3d 1441 (D.C.Cir.1994), requires the Court to read the FCC's definitions narrowly. USWC's reliance on that case is misplaced. *Bell Atlantic* involved a *different* statutory provision predating Section 251(c)(6) of the Act that, unlike section 251(c)(6), "does not expressly authorize an order of physical collocation." *Id.* at 1447. Indeed, it was that very decision that spurred Congress to authorize physical collocation in section 251(c):

> Paragraph (4)(B) [of section 251] mandates actual collocation, or physical collocation, of equipment necessary for interconnection at the premises of a LEC, except that virtual collocation is permitted where the LEC demonstrates that actual collocation is not practical for technical reasons or because of space limitations.... Finally, this provision is necessary to promote local competition because a recent court decision indicates that the Commission lacks the authority under the Communications Act to order physical collocation. (See *Bell Atlantic v. Federal Communications Commission,* 24 F.3d 1441 (D.C.Cir.1994)).

H.R.Rep. No. 104–204, at 73 (1995).

11. Plainly, the Telco Act authorizes collocation in 251(c)(6), and there is no legal basis for the type of narrowing construction that USWC urges here. In fact, the FCC addressed in the *Local Competition Order* the possible impact of the *Bell Atlantic* case on its collocation rules, and concluded that since "section 251(c)(6) *expressly* requires incumbent LECs to provide physical collocation .... under the court's analysis in *Bell Atlantic,* there is

no warrant for a narrowing construction of section 251[.]" *Local Competition Order* ¶ 616 (emphasis added).

12. Accordingly, the provisions of the AT & T and MCI Agreements authorizing collocation of RSUs are AFFIRMED. Judgment shall enter in favor of the CLECs and against USWC on the Sixth Claim for Relief in Civil Action No. 97–D–152 and the Fifth Claim for Relief in Civil Action No. 97–D–2096.

## VI. *USWC'S PICK AND CHOOSE CLAIM (MOST FAVORED NATION)*

### A. *Findings of Fact*

1. USWC challenges the most favored nation ("MFN") provisions (also called "pick and choose" provisions) of the AT & T, MCI, ICG and Sprint agreements that permit those CLECs to incorporate tariff provisions into their interconnection agreements.

2. Specifically, each CLEC defendant requested, and was granted by the CPUC, a clause in their contract allowing them to pick any clause from another contract either agreed to or arbitrated by any other carrier who interconnected with USWC. AT & T Agreement, Part A, Section 20.1; MCI Agreement, Part A, Section 20.1; MFS Agreement, Section XXXIV.B.; ICG Agreement, Section XXXIV.B.; TCG Agreement, Section XXVII.; Sprint Agreement, Section 36.2. USWC opposed all these so-called MFN clauses, but the

CPUC required them based on FCC Rule 51.809, 47 C.F.R. § 51.809. This Rule states in pertinent part that [a]n incumbent LEC shall make available without unreasonable delay to any requesting telecommunication carrier any individual interconnection, service, or network element arrangement contained in any agreement to which it is a party that is approved by a state commission pursuant to section 252 of the Act, upon the same rates, terms, conditions as those provided in the agreement, subject to certain conditions specified in the Rule.

3. This rule was appealed to the Eighth Circuit which invalidated it on July 18, 1997. *Iowa Utilities Bd. v. Fed. Communications Comm'n.*, 120 F.3d 753, 801 (8th Cir.1997), *rev'd sub nom. AT & T v. Iowa Utils. Bd.*, 525 U.S. 366, 396, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). USWC then sought revisions to the contracts to comply with this decision. The CPUC modified the clauses in the AT & T and MCI contracts which had not yet been approved by the CPUC to largely eliminate the ability to substitute individual clauses from other contracts.[4] The CPUC did not, however, order the Agreement to be altered so as to forbid AT & T and MCI from obtaining services pursuant to a tariff.[5]

4. Later, after the CPUC modified the clauses in the AT & T and MCI Interconnection Agreements, the Supreme Court in *AT & T Corp.*, 525 U.S. at 396, 119 S.Ct.

---

**4.** *In re Interconnection Contract Negotiations Between AT & T Communi-cations of the Mountain States, Inc. Pursuant to 47 U.S.C. § 252*, Docket No. 96A–3455, Decision No. C97–857 at 8, App. A at 1 (Colo. PUC Aug. 20, 1997) (J.A. Vol. 10, Tab 98, at R. 24977, 24982) ("AT & T Modification Order"); *In re Petition of MCIMetro Access Transmission Services, Inc. For Arbitration Pursuant to 47 U.S.C. § 252(b) of the Telecommunications Act of 1996 to Establish an Interconnection Agreement with U.S. West Communications, Inc.*, Docket No. 96A–366T, Decision No. C97–858 at 8, App. A at 1 (Colo. PUC Aug. 20, 1997) (J.A. Tab 10, Tab 105, at R. 26130, 26135) ("MCI Modification Order").

**5.** AT & T Modification Order at 8, App. A at 1 (J.A. Vol. 10, Tab 98, at R. 24982); MCI Modification Order at 8, App. A at 1 (*Id.*, Tab 105, at R. 26130, 26135).

721, upheld the FCC's "pick and choose" rule. Based on this ruling, USWC has withdrawn its claim that the CLECs should not be allowed to "pick and choose" provisions in other CLECs' interconnection agreements. However, it continues to contest the interconnection agreements to the extent they allow the CLECs to pick and choose from services in a tariff.

5. The USWC–AT & T and USWC–MCI Interconnection Agreements state as follows:

> The provisions of Section 252(i) of the Act shall apply to this Agreement, including state and federal interpretive regulations in effect from time to time. In the event any governmental authority or agency permits USWC, via tariff, to provide any service covered by this Agreement in accordance with any terms or conditions that individually differ from one or more corresponding terms or conditions of this Agreement, AT & T may elect to amend this Agreement to reflect any such differing terms or conditions contained in such tariff, with effect from the date AT & T makes such election and for the remainder of the terms of this Agreement. The other services covered by this Agreement and not covered by such decision or order shall remain unaffected and shall remain in full force and effect. Notwithstanding the foregoing, AT & T may purchase services out of an effective tariff, regardless of prices set forth in an existing agreement.

AT & T Interconnection Agreement, § 20.1 (J.A. Vol. 13, Tab 126, at R. 25013–14); MCI Interconnection Agreement, § 20.1 (*id.*, Tab 128, at R. 26160–61).

5. The USWC–Sprint agreement states as follows:

> [USWC] shall make available any interconnection, service, or network ·element provided under an agreement approved under Section 252(i) of the Act to which it is a party to Sprint upon the same terms and conditions as those provided in the agreement. Individual interconnection, service, or network elements from another agreement, are available upon acceptance of all the terms and conditions in the agreement related to such interconnection, service or element. Upon proof provided by [USWC] that Sprint causes [USWC] to incur greater costs in the provision of the service than the current carrier's agreement, Sprint will accept the increased costs for the service. [USWC] shall also permit Sprint to purchase services out of an effective tariff, regardless of prices set forth in an existing agreement. [USWC] shall make all agreements available for public viewing within 10 days of approval by the Commission. Sprint will notify [USWC] of its intent to adopt the provisions of another agreement at least 30 days prior to effectuating the change.

Sprint Interconnection Agreement, Section 36.2 (J.A. Vol. 11, Tab 112, at R. 01696).

6. The USWC–ICG agreement states as follows:

> ICG may incorporate and use any interconnection, service or network element from another agreement in accordance with section 252(i) and Decision No. C96–1206. ICG may take service pursuant to this Agreement or in the alternative may order any interconnection, service or network element from any effective, available tariff.

ICG Interconnection Agreement, Section XXXIV.B. (J.A. Vol. 12, Tab 125, at R. 0746).

7. USWC argues that the interconnection tariff filed by USWC pursuant to a CPUC order contains terms which differ from the agreements in this case.

**B.** *Conclusions of Law*

■ 1. To the extent that the Court must determine whether the CPUC violated the Act in imposing the right for CLECs to pick and choose tariff terms, the Court must review this issue *de novo. U S West Communications, Inc. v. Hix,* 986 F.Supp. 13, 19 (D.Colo.1997).

2. The Supreme Court upheld the FCC's "pick and choose" rules that permit requesting carriers to "opt in" to interconnection, unbundled element, and resale arrangements in subsequently approved interconnection agreements. *AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). The Supreme Court did not consider or discuss the ability of requesting carriers to "opt in" to tariffs.

3. Both 47 U.S.C. § 252(i) and 47 C.F.R. § 51.809 govern only a requesting carrier's ability to opt into interconnection agreements entered into under the Act. Section 252(i) provides:

> A local exchange carrier shall make available any interconnection, service, or network element provided *under an agreement approved under this section* [Section 252] to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided *in the agreement.*

47 U.S.C. § 252(i) (emphasis added). A tariff is not "an agreement approved under" Section 252. Indeed, a tariff is not even part of the Section 252 negotiation and arbitration process.

4. FCC Rule 809 also allows requesting carriers only to opt in to other agreements approved by the state commission:

> (a) An incumbent LEC shall make available without unreasonable delay to any requesting carrier any individual interconnection, service, or network element

arrangement *contained in any agreement to which it is a party that is approved by a state commission pursuant to section 252 of the Act,* upon the same rates, terms, and conditions as those provided *in the agreement.*

47 C.F.R. § 51.809(a) (emphasis added).

5. The statute and FCC rules do not permit a requesting carrier to opt into tariff provisions.

6. The Court finds that allowing a CLEC that has executed an interconnection agreement to use a tariff to supplement or supplant any term, condition, or price that is covered by the agreement VIOLATES the Act. That is because such a provision would eviscerate the provisions of 251 and 252 of the Act which require that the parties negotiate the terms of an interconnection agreement and arbitrate those terms that they are not able to agree to. As one court stated the issue, "permitting CLECs to incorporate non-negotiated tariff provisions into their interconnection agreements bypasses the Act entirely and ignores the procedures and standards that Congress has established." *MCI Telecommunications Corp. v. GTE Northwest, Inc.,* 41 F.Supp.2d 1157, 1178 (D.Or.1999).

7. The Act not only encourages parties to negotiate amongst themselves the terms of interconnection agreements, it imposes an affirmative "duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements ...." 47 U.S.C. § 251(c)(2). To facilitate this duty, parties can voluntarily negotiate interconnection agreements "without regard" to the standards in Sections 251(b) and (c). 47 U.S.C. § 252(a). Tariff provisions, however, are not entirely voluntary; rather, the state commission must approve them and can impose terms. *See* Colo.Rev.Stat. § 40–3–102. Thus, permitting a CLEC to opt into tariff provisions is much different than

permitting them to opt into another interconnection agreement which the incumbent LEC had the opportunity to negotiate. Indeed, there is little incentive for carriers to negotiate if they can simply opt into a more favorable tariff than the state commission imposes.

8. Furthermore, permitting CLECs to "pick and choose" from tariff provisions may undermine federal court review of interconnection obligations under the Telco Act. The CPUC in other proceedings in this Court, *U S WEST Communications, Inc. v. ICG Telecom Group, Inc.,* Civil Action No. 99–D–1827, has taken the position that interconnection agreements and the approval or rejection of same are the only thing subject to review in federal court under 47 U.S.C. § 252(e)(6). If the CPUC's argument were accepted, the CPUC and/or other carriers could not be sued in federal court for review of interconnection tariffs that were opted into by a CLEC, essentially eviscerating federal court review of interconnection obligations under the Act. The CPUC could simply purport to apply the Act in a tariff and/or the CLECs could opt into more favorable provisions in a tariff to avoid the exclusive federal court review Congress envisioned.

9. *MCI Telecommunications Corp. v. GTE Northwest, Inc.,* 41 F.Supp.2d 1157 (D.Or.1999) supports the Court's holding. In that case, the court decided that the state commission's requirement that GTE file a tariff listing elements that the state commission had decided must be unbundled and the prices the commission had fixed for those elements conflicted with the Act and was preempted. The Court stated:

> [T]he court … agrees with GTE that the tariff—as presently structured—conflicts with the Act and is preempted. The record reflects that the PUC has not merely adopted a short-form interconnection agreement, along with a list of resale and unbundled element prices that will be incorporated in those agreements. Rather, the PUC has dispensed with the interconnection agreement altogether and is allowing CLECs to order services "off the rack" without an interconnection agreement ….

The distinction is an important one. 47 U.S.C. § 251(d)(3) preserves the PUC's right to enforce state regulations or policies that establish access and interconnection obligations of local exchange carriers, are consistent with the requirements of § 251, and do not substantially prevent implementation of either the requirements of § 251 or the purposes of "this part" (i.e., 47 U.S.C. §§ 251 through 261).

Here, however, the state has done more than simply enforce additional state requirements. It has required GTE to sell unbundled elements or services for resale, to CLECs, via a procedure that bypasses the Act entirely and ignores the procedures and standards that Congress has established.

The PUC may take steps to expedite the interconnection process, but it must do so within the overall framework established by the Act. Before purchasing finished services or unbundled elements from an ILEC, each CLEC must enter into an interconnection agreement. GTE must have the right to ask the CLEC, and the PUC, to include additional or different terms in a particular agreement if GTE believes special circumstances exist. With the exception of negotiated deviations as provided in § 252(a)(1), the agreement must comply with the substantive standards established by the Act (and by the FCC, where appropriate). Finally, GTE must have the right to seek judicial review of

any agreement by the federal court pursuant to § 252(e)(6).

Id. at 1177–78.

■ 10. The CLECs have argued that the non-discrimination provisions of 47 U.S.C. § 202(a) require that they have the right to select any provision in a tariff. That provision of the 1934 Act, however, generally governs interstate, not intrastate, service. Also, *Sea–Land Service, Inc. v. ICC,* 738 F.2d 1311, 1317 (D.C.Cir. 1984), held that contract rates approved under appropriate commission procedures do not "inherently conflict with a common carrier's duty of nondiscrimination." *See also Competitive Telecom Assn. v. Fed. Communications Comm'n,* 998 F.2d 1058, 1063 (D.C.Cir.1993).

11. To the extent the CLECs are concerned that they should have the option to have available to them a generally-available set of terms and conditions governing the provision of services by USWC, the Act provides this to them in the form of a Statement of Generally Available Terms ("SGAT") under 47 U.S.C. § 252(f). Moreover, if the CLECS wish to have a tariff term incorporated into the interconnection agreements, they are free to seek an amendment of the interconnection agreement.

12. Accordingly, the Court holds that the MFN or pick and choose provisions of the interconnection agreements, to the extent they permit CLECs to incorporate tariff provisions into their interconnection agreements, VIOLATE the Act and are VACATED. Judgment shall be entered in favor of USWC and against AT & T, MCI, Sprint and ICG on the Second Claim for Relief in Civil Action Numbers 97–D–152, 97–D–1667 and 97–D–2096 to the extent that the claim seeks relief on this issue.

## VII. MCI's CLAIM REGARDING SELECTION OF PROVISIONS FROM OTHER CARRIERS' AGREEMENTS WITH USWC

### A. *Findings of Fact*

1. MCI challenges the CPUC's decision striking the term in its Interconnection Agreement allowing MCI to choose individual provisions from USWC's Agreements with other new entrants for incorporation into the MCI Agreement. Specifically, MCI challenges part A, § 20.1 of its Agreement, which originally provided:

The provisions of Section 252(i) of the Act shall apply to this Agreement, including state and federal interpretive regulations in effect from time to time. In the event any governmental authority or agency permits [US West], via tariff *or agreement,* to provide any service covered by this Agreement in accordance with any terms or conditions that individually differ from one or more corresponding terms or conditions of this Agreements, [MCI] may elect to amend this Agreement to reflect any such differing terms or conditions contained in such tariff *or agreement,* with effect from the date [MCI] makes such election and for the remainder of the term of this Agreement.

J.A. Vol. 13, Tab 128, at R. 26160–26161 (emphasis added).

2. After initially ordering that the MCI Agreement include the words "or agreement" as set forth in bold and underline above, the CPUC later, reversed that decision and ordered that those words be stricken from the Agreement. *In re Petition of MCIMetro Access Transmission Services, Inc. for Arbitration Pursuant to 47 U.S.C. § 252(b) of the Telecommunications Act of 1996 to Establish an Interconnection Agreement with U S West Communications, Inc.,* Docket No. 96A–366T, Decision No. C97–858 at 8, App. A at 1

(Colo. PUC Aug. 20, 1997) (J.A. Vol. 10, Tab 105, at R. 26130, 26135) ("MCI Modification Order").

3. When the CPUC initially ruled that the interconnection agreement must permit MCI to choose individual provisions from other agreements, the FCC's Rule 809, 47 C.F.R. § 51.809, was in effect. Rule 809 interpreted § 252(i) of the Act to require incumbents such as USWC to allow new entrants to choose individual provisions from other agreements. After the CPUC issued its initial order, the Eight Circuit vacated Rule 809. *Iowa Utils. Bd. v. Fed. Communications Comm'n*, 120 F.3d 753, 801 (8th Cir.1997). Relying on that decision, the CPUC reversed its initial ruling and struck the words "or agreement" from the MCI–USWC Agreement. Since MCI brought this action challenging that ruling, the Supreme Court has now reversed the Eighth Circuit's decision and reinstated Rule 809. *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 396, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

### B. *Conclusions of Law*

1. The CPUC's interpretation of the Act is a question of law subject to this Court's *de novo* review. *U S West Communications, Inc. v. Hix*, 986 F.Supp. 13, 19 (D.Colo.1997).

2. The CPUC erred as a matter of law when it eliminated MCI's right to choose individual provisions from USWC's agreements with other carriers.

3. Section 252(i) of the Act, referred to as the "most favored nation" or "pick and choose" provision, requires that "[a] local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement." 47 U.S.C. § 252(i). In the *Local Competition Order* and Rule 809, the FCC interpreted § 252(i) to require incumbents to make available "without unreasonable delay to any requesting telecommunications carrier any individual interconnection, service, or network element arrangement contained in any agreement to which it is a party that is approved by a state commission pursuant to § 252 of the Act, upon the same rates, terms, and conditions as those provided in the agreement." 47 C.F.R. § 51.809(a); *Local Competition Order* ¶ 1314. Rule 809 provides two exceptions to that general provision, where the incumbent can prove: (1) that the costs of providing a particular interconnection, service, or element to the requesting new entrant are greater than the costs of providing it to the new entrant that originally negotiated the agreement; or (2) that provisioning the requested interconnection, service, or element is not technically feasible. 47 C.F.R. § 51.809(b).

4. The Eighth Circuit vacated Rule 809, finding that allowing new entrants to choose a favorable provision of an existing interconnection agreement without accepting the corresponding concessions made to the incumbent by the new entrant who negotiated that favorable provision would discourage "the give and take process that is essential to successful negotiations." *Iowa Utils. Bd.*, 120 F.3d at 801 (8th Cir. 1997). The Supreme Court reversed the Eighth Circuit's decision and reinstated Rule 809, holding that the rule "tracks the pertinent statutory language almost exactly." *AT & T Corp.*, 525 U.S. at 396, 119 S.Ct. 721. Indeed, the Supreme Court concluded that Rule 809 "is more generous to incumbent [carriers] than § 252(i) itself." *Id.* In the wake of the Supreme Court's decision, at least one other district court has held that an interconnection agreement *must* contain a "most favored

nation" provision. *U S West Commun., Inc. v. Jennings*, 46 F.Supp.2d 1004, 1027 (D.Ariz.1999).

5. This Court must follow the Supreme Court's decision and apply the FCC regulations reinstated by that Court. *See MCI Telecommunications Corp. v. U.S. West Commun., Inc.*, 204 F.3d 1262, 1268 (9th Cir.2000); *AT & T Communications Systems v. Pacific Bell*, 203 F.3d 1183, 1187–88 (9th Cir.2000); *GTE South, Inc. v. Morrison*, 199 F.3d 733, 740–41 (4th Cir.1999); *Bell Atlantic–Delaware, Inc. v. McMahon*, 80 F.Supp.2d 218, 235–36 (D.Del.2000); *MCI Telecomms. Corp. v. Michigan Bell Tel. Co.*, 79 F.Supp.2d 768, 788 (E.D.Mich. 1999); *MCI Telecomms. Corp v. Bell Atlantic–Pennsylvania, Inc.*, No. 97–1857, Magistrate's Report & Recommendation at 32–33 (M.D.Pa. Sept. 16, 1999); *AT & T Commun. of Southwest, Inc. v. Southwestern Bell Tel. Co.*, 86 F.Supp.2d 932, 948–49 (W.D.Mo.1999); *U S West Commun., Inc. v. Thoms*, No. 4–97–CV–70082, slip op. at 51 (S.D.Iowa Apr. 19, 1999); *MCI Telecomms. Corp. v. U.S. West Commun., Inc.*, No. 97–CV–919, slip op. at 11–12 (D.Minn. Mar. 30, 1999); *AT & T Commun. of the Midwest, Inc. v. U.S. West Commun., Inc.*, No. 97–CV–917, slip op. at 10–11 (D.Minn. Mar. 30, 1999).

6. USWC asserts that MCI's challenge should be rejected because Section 20.1 of the Agreement simply incorporates 47 U.S.C. § 252(i) and any FCC pronouncements. The Court does not agree. By taking out the word "agreement" in that section, the "pick and choose" provision of the MCI Agreement as approved by the CPUC is inconsistent with § 252(i) and Rule 809. As originally approved by the CPUC, prior to the Eighth Circuit's decision, that provision complied with federal law.

7. Therefore, judgment shall be entered in favor of MCI on Count XII of its Complaint in Civil Action 97–D–2047, and this issue shall be REMANDED to the CPUC. The CPUC is directed to reform Section 20.1 of the interconnection agreement to conform with the original language approved by the CPUC which gave MCI the right to choose individual provisions from USWC's agreements with other carriers.

## VIII. *CONCLUSION*

Based upon the foregoing, it is

ORDERED that USWC's Notice of Withdrawal of Moot Claims filed April 5, 2000, is **GRANTED IN PART AND DENIED IN PART** consistent with this Order. It is

FURTHER ORDERED that the Second Claim for Relief in Civil Action Numbers 97–D–152, 97–D–1667 and 97–D–2096 is **DISMISSED IN PART** to the extent that it asserted that the CLECs should not be allowed to "pick and choose" provisions in other CLECs' interconnection agreements. It is

FURTHER ORDERED that **JUDGMENT SHALL BE ENTERED** in favor of Plaintiff USWC and against Defendants AT & T, MCI, Sprint and ICG on the remaining portion of the Second Claim for Relief in Civil Action Numbers 97–D–152, 97–D–1667 and 97–D–2096 that allows the CLECs to pick and choose and incorporate tariff provisions into the interconnection agreements. It is

FURTHER ORDERED that **JUDGMENT SHALL BE ENTERED** in favor of MCI on Count Twelve of its Complaint in Civil Action 97–D–2047 and against USWC. The Clerk of Court is directed to **REMAND** this issue to the CPUC, who is directed to reform Section 20.1 of the MCI–USWC interconnection agreement to conform with the original language approved by the CPUC which gave MCI the

right to choose individual provisions from USWC's agreements with other carriers. It is

FURTHER ORDERED that the Third Claim for Relief in 97–D–152, 97–D–1667, and 97–D–2096 is **DISMISSED IN PART** to the extent that it challenges provisions requiring USWC to resell services already subject to wholesale discounts. It is

FURTHER ORDERED that the Seventh Claim for Relief in 97–D–152, the Fifth Claim for Relief in 97–D–1667, and the Sixth Claim for Relief in 97–D–2096 are **DISMISSED IN PART** to the extent they challenge the interconnection agreements' requirement to sell unregulated and deregulated services. It is

FURTHER ORDERED that **JUDGMENT SHALL BE ENTERED** in favor of Plaintiff USWC and against Defendants AT & T, MCI, Sprint and MFS/WorldCom on the remaining portions of the Third and Seventh Claims for Relief in 97–D–152, the Fifth Claim for Relief in 97–D–1667, and the Third and Sixth Claims for Relief in 97–D–2096 that require USWC to provide "telecommunications services" in the form of "enhanced" or "informational" services, such as voice mail and inside wire maintenance. It is

FURTHER ORDERED that **JUDGMENT SHALL BE ENTERED** in favor of AT & T on Count One of its Cross Claim and Counterclaim in Civil Action No. 97–D–2096 and against USWC. The Clerk of Court is directed to **REMAND** this issue to the Colorado Public Utilities Commission, who is directed to modify the USWC–AT & T Agreement to require USWC to offer to AT & T contract service arrangements for resale at a wholesale discount. It is

FURTHER ORDERED that **JUDGMENT SHALL BE ENTERED** in favor of AT & T on Count Two of its Cross

Claim and Counterclaim in Civil Action No. 97–D–2096 and against USWC. The Clerk of Court is directed to **REMAND** this issue to the Colorado Public Utilities Commission, who is directed to modify the USWC–AT & T Agreement to permit AT & T to obtain promotional offerings of 90 days or less at the retail rate specified in the *Local Competition Order.* It is

FURTHER ORDERED that the Sixth Claim for Relief in 97–D–152 and the Fifth Claim for Relief in 97–D–2096 are **DISMISSED IN PART** to the extent that they challenge provisions of the interconnection agreements that require USWC to permit collocation at USWC's "premises." It is

FURTHER ORDERED that **JUDGMENT SHALL BE ENTERED** against Plaintiff USWC and in favor of the Defendants AT & T, MCI and TCG on the remaining portions of the Sixth Claim for Relief in 97–D–152 and the Fifth Claim for Relief in 97–D–2096 that allege collocation issues. It is

FURTHER ORDERED that the Tenth Claim for Relief in 97–D–152 relating to "bill and keep" mechanism for recovery of transport and termination costs is **DISMISSED IN ITS ENTIRETY.** It is

FURTHER ORDERED that the Eleventh Claim for Relief in 97–D–152 and Seventh Claim for Relief in 97–D–1667 relating to the division of access charges are **DISMISSED IN THEIR ENTIRETY.** It is

FURTHER ORDERED that the Twelfth Claim for Relief in 97–D–152, Eighth Claim for Relief in 97–D–1667 and Fourteenth Claim for Relief in 97–D–2096 relating to denial of due process are **DISMISSED IN THEIR ENTIRETY.** Finally, it is

ORDERED that the Twelfth Claim for Relief in 97–D–2096 is **DISMISSED IN**

PART to the extent that it relates to unbundling of vertical switching features.